UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                               :

ANNE LOWN, ALICE BERGERON, STEVEN   :             04 Civ. 1562 (SHS)
BIELARSKI, KATHLEEN COGAN-KOZUSKO,  :
DIANE COPES, MARY JANE DESSABLES, ERIC  :       OPINION & ORDER
FINE, MARGARET GEISSMAN, SHANTEE    :
GORDON, JESSICA GORHAM, KYOKO INOUYE,  :
ALFREDA LEE-KATZ, PETR NIKICHIN, ESTELA  :
NUNEZ, MARINA OBERMAIER, JAMES PRESLEY,:
DANIEL QUANE, ANJA TAEKKER,           :
                               :
               Plaintiffs       :
                               :
             -against-        :
                               :
THE SALVATION ARMY, INC., THE CITY OF   :
NEW YORK, JOHN B. MATTINGLY, Commissioner,:
New York City Administration for Children's   :
Services, NEIL HERNANDEZ, Commissioner, New  :
York City Division of Juvenile Justice, THOMAS A.  :
MAUL, Commissioner, New York State Office of  :
Mental Retardation and Developmental Disabilities,  :
ANTONIA C. NOVELLO, Commissioner,     :
New York State Department of Health, ROBERT  :
SHERMAN, Commissioner, Nassau County    :
Department of Social Services, JANET DEMARZO,  :
Commissioner, Suffolk County Department of Social  :
Services,                           :
                  Defendants.   :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       Current and former employees of the Salvation Army bring this action for relief from the

Salvation Army's efforts to enforce compliance with its religious mission among its staff. Plaintiffs

claim to have been subjected to unlawful religious discrimination and have brought suit against the

Salvation Army, as well as against the City of New York and the commissioners of several state and

local government entities that contract with the Salvation Army for the provision of social services.

Plaintiffs allege violations of the First and Fourteenth Amendments to the U. S. Constitution, Title

1

VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., and various provisions of state and local law. All defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

As plaintiffs have failed to allege that the discrimination they suffered can properly be attributed to the government defendants, the motion of the government defendants is granted, except insofar as it pertains to plaintiffs' taxpayer-standing-based Establishment Clause claim. Because the Salvation Army is not a state actor, and because it enjoys statutory exemptions from liability for religious discrimination, its motion to dismiss is granted with respect to all claims against it, except plaintiffs' retaliation claims pursuant to state and city law.

Table of Contents

I. Background                                                                              3
  A. The Parties                                                                           3
  B. The Salvation Army's Programs                                                          4
  C. Interaction Between Government Agencies and the Salvation Army                         5
  D. Diversion of Funds to the Salvation Army Church                                        6
  E. The Reorganization Plan                                                                6
  F. Content of Services Delivered                                                         12
  G. Procedural History                                                                    13
II. Analysis                                                                               14
  A. Standard                                                                              14
  B. The Government Defendants' Motion                                                      14
    1. Equal Protection                                                                    15
    2. Establishment Clause                                                                19
      a. Standing                                                                          19
      b. Stating an Establishment Clause Claim                                             22
  C. The Salvation Army's Motion                                                            24
    1. Constitutional Claims Against The Salvation Army                                      25
      a. Federal Constitutional Claims                                                      25
      b. State Constitutional Claims                                                        30
    2. Employment Discrimination Claims                                                     32
      a. Federal Employment Discrimination Claim                                            33
      b. State and Local Employment Discrimination Claims                                   43
    3. Retaliation Claims                                                                   45
III. Conclusion                                                                            47

## I. Background

The factual allegations, as set forth in the Amended Complaint, are recounted below.

## A. The Parties

The plaintiffs, eighteen present and former employees of the Salvation Army,[1] include taxpayers of each of the jurisdictions represented by the government defendants. (Am. Compl. ¶¶ 2, 15). Sixteen of the plaintiffs have worked at Social Services for Children ("SSC"), a Salvation Army program that provides social services on behalf of the City of New York, the State of New York and the Counties of Nassau and Suffolk. (Id. ¶ 1).

The defendants are the Salvation Army, the City of New York and the commissioners of several state and local government entities that contract with the Salvation Army for the provision of social services. The Salvation Army is a not-for-profit corporation organized pursuant to the laws of the State of New York. (Id. ¶ 41). John B. Mattingly is the Commissioner of the New York City Administration for Children's Services; Neil Hernandez is the Commissioner of the New York City Division of Juvenile Justice; Thomas A. Maul is the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities; Antonia C. Novello is the Commissioner of the New York State Department of Health; Robert Sherman is the Commissioner of the Nassau County Department of Social Services; Janet DeMarzo is the Commissioner of the

---

[1] Anne Lown was the Associate Director of SSC (Am. Compl. ¶ 22); Alice Bergeron is the Mental Health Department Office Manager of SSC (id. ¶ 23); Steven Bielarski was the Assistant Director of Training of SSC (id. ¶ 24); Kathleen Cogan-Kozusko was the Director of Foster Home and Adoption Services of SSC (id. ¶ 25); Diane Copes was a Family Caseworker in the Foster Home Adoption Services Department of SSC (id. ¶ 26); Mary Jane Dessables was the Management Information Systems Director of SSC (id. ¶ 27); Eric Fine is the Assistant Director of Clinical Services in the HIV Services Program of SSC (id. ¶ 28); Margaret Geissman was the Director of the Human Resources Department of SSC (id. ¶ 29); Shantee Gordon is a Group Home Independent Living Specialist at SSC (id. ¶ 30); Jessica Gorham was a Social Worker/Foster Care Caseworker in the Foster Home and Adoption Services Department of SSC (id. ¶ 31); Kyoko Inouye was a Social Worker/Foster Care Caseworker in the Foster Homes and Adoption Services Department of SSC (id. ¶ 32); Alfreda Lee-Katz is the Director of the Independent Living Program of SSC (id. ¶ 33); Petr Nikichin was a Human Resources Assistant at SSC (id. ¶ 34); Estela Nunez is the Recruitment Coordinator in the Foster Home and Adoption Services Department of SSC (id. ¶ 35); Marina Obermaier was the Assistant Director for Homefinding of SSC (id. ¶ 36); James Presley is the Mental Health Coordinator for the Manhattan Unit of the HIV Services Program of the Salvation Army (id. ¶ 38); Daniel Quane is the Director of Training for SSC (id. ¶ 39); and Anja Taekker is a Foster Care Caseworker in the Foster Home and Adoption Services Department of SSC (id. ¶ 40).

3

Suffolk County Department of Social Services (collectively, the "individual defendants"). (Id. ¶ 43-48). Each of the individual defendants is sued in his or her official capacity for injunctive relief. (Id.). Together with the City of New York, the individual defendants are referred to as the "government defendants."[2]

B. The Salvation Army's Programs

The Greater New York Division of the Eastern Territory of the Salvation Army runs programs in New York City and several surrounding counties, including Nassau and Suffolk. (Am. Comp. ¶ 53). The Greater New York Division administers social services through two organizations, SSC and Social Services for Families and Adults ("SSFA"). (Id. ¶ 54). Under contract with the government defendants (id. ¶ 61), SSC runs various programs, a number of which involve government-mandated custodial care. (Id. ¶ 68). Nearly 90% of the clients SSC serves are referred by, or in the custody of, government agencies and are assigned to SSC involuntarily. (Id. ¶¶ 3-4, 66-67). Among the services that SSC provides to more than 2,300 clients daily are: "foster care and adoption services, group homes, boarding homes, a non-secure detention facility for juvenile delinquents, services for children with developmental disabilities, HIV services, and group day care." (Id. ¶¶ 3, 65). SSC is subject to significant regulatory oversight in the provision of these services. For example, SSC is an "authorized agency" pursuant to New York Social Services Law § 371(10) for providing child welfare services, a registered family day care provider in New York City and a licensed group day care provider in Nassau County. (Id. ¶¶ 57-59).

SSC derives more than 95% of its approximately $50 million budget from its contracts with government entities. (Id. ¶ 60). Consequently, the salaries of SSC's 900 employees are paid

---

[2] The United States is participating in this litigation as amicus curiae on the grounds that it has a particular interest in the outcome due to its charitable choice initiatives, which enable religious organizations to compete for federal contracts without abandoning their rights to discriminate in employment on the basis of religion. See 42 U.S.C. § 604a; see also White House Office of Faith-Based and Community Initiatives, Protecting the Civil Rights and Religious Liberty of Faith-Based Organizations: Why Religious Hiring Rights Must Be Preserved, http://www.whitehouse.gov/government/fbci/booklet.pdf (last visited Sept. 30, 2005).

virtually in full with funds that SSC receives through its government contracts.  (Id. ¶ 64).  Those

contracts prohibit SSC from engaging in unlawful employment discrimination.  (Id. ¶ 62).

C. Interaction Between Government Agencies and the Salvation Army

Plaintiffs allege several forms of cooperation between the government defendants and the

Salvation Army.  First, SSC staff and government employees allegedly work together to administer

various services that SSC provides.  (Am. Compl. ¶¶ 65-89).  For example, with respect to foster

care services in the City of New York, staff from the Administration for Children's Services and

SSC work in concert to "recruit potential adoptive parents, give orientations and training sessions,

evaluate the suitability of pre-adoptive homes and coordinate the adoption process from initial

planning to the adoption finalization in court proceedings."  (Id. ¶ 72).  Second, as mandated by the

government agencies with which it has contracts, SSC operates a variety of accounting systems for

keeping track of payments to, and accounts maintained on behalf of, certain clients. [3]  (Id. ¶¶ 92-95).

The State pays for much of the computer equipment necessary to manage these accounts.  (Id. ¶ 93).

Third, SSC must use several government-mandated systems for standardization of child welfare

data.[4]  (Id. ¶¶ 98-110).  SSC's in-house data is routinely merged with data from the state's central

registry.  (Id. ¶ 106).  The data coordination procedures allegedly involve close cooperation among

SSC and the relevant government agencies.  (Id.).  Fourth, the government defendants impose

specific training requirements on SSC staff and clients.  For example, SSC foster parents must

_____

[3] SSC transfers payments on behalf of New York State, New York City and Nassau County to over 350 foster parents
and family care providers, as well as to over 100 family day care providers.  (Am. Compl. ¶ 94).  For some of its
teenage clients and disabled clients, SSC oversees savings accounts, the funds for which come from the State, the City
and Nassau County.  (Id. ¶¶ 96-97).  The State, the City and Nassau County routinely audit SSC to ensure compliant
data entry and accounting with respect to these accounts.  (Id. ¶ 95).
[4] These include CONNECTIONS, New York's Statewide Automated Child Welfare Information System (Am. Compl. ¶
100); numerous program data report protocols (id. ¶ 102); the New York State Central Childcare Registry System (id. ¶
103); HIPS, the ACS health tracking system (id. ¶ 104); PROMIS, the ACS preventative tracking system (id. ¶ 105);
Stardat, the ACS system for tracking the amount of time children spend in foster care (id ¶ 107); EQUIP scores used to
determine "census capacities for programs and priority on allocation and assignment of new cases to agencies by ACS"
(id. ¶ 109); and New York State's Quality Assurance standards for mandated services (id. ¶ 110).

receive 30 hours of "Model Approaches to Partnership in Parenting" training, and SSC social workers must receive five days of new social worker training. (Id. ¶¶ 112-13). In addition, SSC child care workers, foster parents and social workers are required to undergo annual training on various topics including "child neglect and abuse, AIDS prevention and understanding, working with people with AIDS, first aid, CPR and Therapeutic Crisis intervention." (Id. ¶ 114).

D. Diversion of Funds to the Salvation Army Church

Plaintiffs allege that SCC provides 10% of the revenue from its government contracts to the Salvation Army Church in the form of "field service" payments. (Am. Compl. ¶ 115). Although these payments purportedly reimburse the Salvation Army Church for administrative overhead expenses, SSC allegedly receives little administrative support in exchange. (Id. ¶ 116). Plaintiffs contend that SSC and its programs pay for their own administrative support despite making the "field service" payments. (Id. ¶ 116). The Salvation Army Church allegedly uses the "field service" payments to advance its religious mission. (Id. ¶ 118).

E. The Reorganization Plan

Historically, the Salvation Army did not scrupulously monitor SSC employees for adherence to the Salvation Army's religious tenets. SSC had its own secular mission statement. (Am. Compl. ¶ 150). Nevertheless, in the several months leading up to the filing of the complaint, the Salvation Army began to infuse religion into SSC's workplace. (Id. ¶ 6). The Salvation Army implemented a "Reorganization Plan" meant to advance a "One Army Concept" whereby the Salvationist spirit would be promoted among the Salvation Army's social service programs. (Id. ¶¶ 120-22). The Reorganization Plan ensured that "'a reasonable number of Salvationists along with other Christians [will be employed]' because The Salvation Army is 'not a Social Service Agency [but] a Christian Movement with a Social Service program.'" (Id. ¶ 120). The goal was that "'[t]here should be one Salvation army with a single Mission Statement, driven by the vision of one leader.'" (Id. ¶ 122).

The Reorganization Plan outlined new responsibilities for Salvation Army leaders. For example, the Secretary for Personnel of the Greater New York Division must "'conduct Sunday and weekday meetings at corps, residences, and <u>social service institutions</u>, within the division, with the aim of leading souls to Christ, the growth of Christian faith among the Salvation Army, and the instruction of our soldiers in Salvationism.'" (<u>Id.</u> ¶ 123) (emphasis in Am. Compl.). The Secretary for Social Services must "'safeguard the essential Christian perspective towards social services" and "<u>promote the unique spirit of Salvationism in social services</u>.'" (<u>Id.</u> ¶ 124) (emphasis in Am. Compl.). The Reorganization Plan further directed that the Secretary for Personnel and the Secretary for Social Services of the Greater New York Division each "'conduct all activities of his office with a view to accomplishing the Army's fundamental purpose of proclaiming Jesus Christ as Savior and Lord, which purpose must find expression in both the message proclaimed and the ministry of service performed.'" (<u>Id.</u> ¶¶ 123-24).

The Reorganization Plan has affected the procedures of SSC's human resources operation. The Salvation Army's mission statement now appears on job descriptions and postings and reads as follows:

> The Salvation Army, an international movement, is an evangelical part of the universal Christian church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination.

(<u>Id.</u> ¶ 151). The Reorganization Plan also expressed concern about having a non-Christian Director of Human Resources at SSFA:

> [W]e have chosen to hire a Director of Human Resources for Social Services for Families and Adults, who represents an eastern religion … Is it responsible to have a Buddhist or Hindu present the Army's Mission Statement and to expect that she will be able to represent us well when questions are asked? We are not a Social Service Agency. We are a Christian Movement with a Social Service Program.

(Id. ¶ 125). Salvation Army leaders conveyed similar anxiety regarding the religious affiliation of human resources staff at SSC. In March of 2003, Colonel Paul Kelly required the Director of Human Resources at the Divisional Headquarters, Maureen Schmidt, to contact SSC's Human Resources Director, plaintiff Margaret Geissman, in order to collect information on the religious affiliation of SSC Human Resources staff. (Id. ¶ 126). After Geissman refused to compile the requested information, she was informed by Schmidt that "'they are going to find out about everyone eventually because they want more Christians, especially Salvationists employed at SSC.'" (Id.). Kelly also voiced concern that Geissman might be Jewish, but Schmidt informed him that she was not. (Id. ¶ 127).

Schmidt asked Geissman to name the homosexuals working at SSC, but Geissman refused to comply. (Id. ¶ 128). Geissman complained to Schmidt and to then-SSC Executive Director Robert Gutheil that she felt the questions of Kelly and Schmidt were harassing and discriminatory. (Id.). Gutheil communicated Geissman's and his own concerns regarding the questioning to the leadership at Divisional Headquarters. (Id. ¶ 130). The Salvation Army allegedly took no action to address the complaints. (Id. ¶ 133).

Before the advent of the One Army Concept, the Salvation Army's Employee Manual had expressly stated that the Salvation Army was not waiving "any right in the free exercise of religion" in its employment practices. (Id. ¶ 134). Nevertheless, a June 4, 2003 memorandum stated a principle of non-discrimination by SSC in employment with respect to creed. (Id. ¶¶ 134-36). Around September 16, 2003, Major Henrietta Klemanski, Secretary for Personnel for the Eastern Territory, distributed a memorandum announcing the abandonment of all addenda to the Employee Manual, including the June 4, 2003 memorandum. (Id. ¶¶ 137-38). Approximately six months later, the Employee Manual was officially revised to eliminate the principle of non-discrimination

with respect to creed that was contained in the June 4, 2003 memorandum.[5]  (Id. ¶ 139).  The

revised Employee Manual included a section entitled "'The Rules of Conduct,'" which provided

that although "'[t]he Salvation Army does not make employment decisions on the basis of an

individual's sexual orientation or preference[,]'"  it nonetheless "'reserve[s] the right to make

employment decisions on the basis of an employee's conduct or behavior that is incompatible with

the principles of the Salvation Army.'"  (Id. ¶ 140).

Employees also allegedly had to fill out a form acknowledging the receipt of the Employee

Manual.  That form contained the following statements:

> I understand The Salvation Army's status as a church and agree I will do
> nothing as an employee of The Salvation Army to undermine its religious
> mission.
>
> I agree and understand that my services are a necessary part of The
> Salvation Army's programs and that my conduct must not conflict with,
> interfere with, or undermine the Army's programs or the Army's purposes.

(Id. ¶ 141).

In effectuating the One Army Concept, the Salvation Army distributed a "Work with Minors

Form" that all employees were required to complete.  (Id. ¶ 142).  That form mandated disclosure of

employees' "Present Church, Minister of Church, Other Churches attended regularly during the past

---

[5] The Employee Manual, revised as of January 1, 2004 reads, in pertinent part:

> It is the policy of the Salvation Army that it will provide equal opportunity for employment …
> except where a prohibition on discrimination is inconsistent with the religious principles of The
> Salvation Army.
>
> As a religious organization, a branch of the Christian church, The Salvation Army reserves the
> right to make such employment decisions, adopt employment policies (including employee
> benefits) which are calculated to promote the religious and moral principles for which it is
> established and maintained, consistent with its rights to the free exercise of its religion guaranteed
> to it by the Constitution of the United States.
>
> Without limiting the foregoing, by accepting employment with The Salvation Army, an individual
> acknowledges that The Salvation Army is a church, agrees to do nothing to undermine its religious
> mission, and acknowledges that conduct must not conflict with or undermine the religious
> programs of The Salvation Army, or its religious and moral purposes.

(Id. ¶ 139).

ten years." (Id. ¶ 143). It also directed employees to permit the Salvation Army to procure

information from employees' churches regarding the fitness of those employees to work with

minors.[6] (Id. ¶ 146).

After communicating his disagreement with the policy of compelling SSC employees to sign

the Work with Minors Form, then-Executive Director of SSC Robert Gutheil was fired. (Id. ¶¶ 154-

56). Alfred J. Peck, who had been Director of SSFA, became the Acting Director of SSC. (Id. ¶

157). Plaintiff Lown was asked to assume Gutheil's job duties, but was demoted from Associate

Executive Director to Associate Director. (Id.). Peck instructed Lown that all employees were to

sign the Work with Minors Form by January 1, 2004. (Id. ¶ 158). He insisted that each employee

record specific information and that answering questions by writing "not applicable" was not an

option. (Id. ¶ 159). Despite Peck's orders, Lown and Geissman agreed that they would not require

_____

[6] On the Work with Minors Form, employees were required to sign a statement containing the following
representations:

> 6. I authorize any of the churches or other organizations and their representatives and my personal
> references listed above to give The Salvation Army any information they may have regarding my
> character and fitness to work with children. I release all such organizations and individuals from
> any liability that may result from their furnishing such information to The Salvation Army. I
> waive any right that I may have to inspect any records containing such information.

> 7. I am aware that The Salvation Army is a branch of the Christian Church and minister, as well as other churches attended during the past ten
> conduct myself in my work with children in a way that is consistent with the religious and
> charitable policies and principles of The Salvation Army.

> 8. Having provided the foregoing information and having affirmed the foregoing statements are
> true, I recognize that any false information or statements are punishable under the laws relating to
> perjury.

(Am. Compl. ¶ 146).
    The Salvation Army has submitted a revised Work with Minors Form that does not contain questions
requiring identification of present church and minister, as well as other churches attended during the past ten
years. (See Ex. B to Aff. of Michael G. Dolan in Supp. of Salvation Army's Mot. to Dismiss the Compl. dated
May 14, 2004 ("Dolan Aff.")). The revised form still includes the representations numbered 6, 7 and 8 listed
above. (See id.). The affidavit to which the revised form is appended explains that the revised form "was
approved for implementation nationally by The Salvation Army as of February 2004." (Dolan Aff. ¶ 3). It is
unclear, however, whether the revised form is in fact being used in place of the prior version. Nevertheless, on
a motion to dismiss the complaint, the Court is required to construe factual allegations in the complaint as true
and not to take extraneous evidence into account. See Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels
& Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). Therefore, the Court has not considered the
modified Work With Minors Form.

10

new employees to sign the Work with Minors Form, and that they would send employment packages to Divisional Headquarters for approval without that form. (Id. ¶ 161). At the end of October of 2003, Divisional Headquarters refused to approve new SSC hires because their employment packages did not include Work with Minors Forms. (Id. ¶ 163).

On or about October 28, 2003, at a meeting of the SSC Cabinet, Peck explained to the senior managers of all SSC departments and programs that all job descriptions had to include the mission statement of the Salvation Army and that any employee refusing to sign a job description would be fired. (Id. ¶ 162). In November, Divisional Headquarters rejected new SSC job postings that lacked the Salvation Army's mission statement. (Id. ¶ 164). That same month, Geissman resigned because of the allegedly hostile work environment at SSC. (Id. ¶ 165). Petr Nikichin assumed Geissman's duties, but he resigned in February of 2004 for similar reasons. (Id. ¶ 166).

In late December, Peck informed Lown that she would be responsible for reporting the employees who failed to complete the Work with Minors Form by New Year's Day. (Id. ¶ 170). He also instructed that she formulate a corrective action plan for getting all employees who missed the January 1 deadline to sign the form. (Id.). In a January 1, 2004 memorandum to Peck, Lown – who in December had filed charges against the Salvation Army with the U.S. Equal Employment Opportunity Commission – conveyed an unwillingness to develop a corrective action plan in light of the fact that she had disputed the legality of the Work with Minors Form. (Id. ¶¶ 169, 171). Peck then relieved Lown of responsibility for obtaining completed Work with Minors Forms and reprimanded her for questioning whether it was appropriate to require SSC staff to attend an HIV training program with a religious focus. (Id. ¶¶ 172, 187-91). Lown resigned in February of 2004 because of the allegedly hostile work environment at SSC. (Id. ¶ 22). Peck requested that the various SSC program directors distribute the form to their respective staff members and collect the

completed forms before February 27, 2004; he also notified the directors that anyone who did not complete the form would be deemed "insubordinate" and fired. (Id. ¶¶ 173-74).

Plaintiffs allege that since the Reorganization Plan efforts began, manifestations of Christian faith have appeared in the workplace, including recitation of prayers at staff meetings and functions, frequent depositing of religious publications in employee mailboxes, conspicuous display of religious publications and regular public postings for prayer meetings and other religious events. (Id. ¶ 183). Plaintiffs claim that these circumstances and the Salvation Army's intrusive inquiries have contributed to a hostile work environment that led to the constructive termination of plaintiffs Lown, Bielarski, Cogan-Kozusko, Copes, Dessables, Geissman, Gorham, Inouye, Nikichin and Obermaier. (Id. ¶¶ 8, 10, 22, 24-27, 29, 31-32, 34, 36).

F. Content of Services Delivered

Plaintiffs allege that the Reorganization Plan initiatives "conflict with plaintiffs' ethical and professional obligations as social workers…." (Am. Compl. ¶¶ 8, 147, 152, 175). Plaintiffs explain that they:

> cannot, as a matter of conscience and professional responsibility, sign a form stating that they would acknowledge and support The Salvation Army's Evangelical Christian teachings, and fear that the new religious requirements will require them to provide mandated, government-funded social services to children in a manner that conflicts with their legal and professional obligations. For example, the children assigned to receive foster care and other services from The Salvation Army include sexually active teenagers who are at risk for HIV, sexually transmitted infections and unintended pregnancy. However, The Salvation Army condemns, among other things, non-marital sexual relationships, contraceptive use outside of marriage, homosexuality, abortion, social drinking, gambling, smoking and drug use as "unacceptable according to the teaching of Scripture." Consequently, Plaintiffs claim that their legal and professional obligation to provide these teenagers with services conflicts with the religious principles of The Salvation Army.

(Id. ¶ 9; see also id. ¶ 176). Plaintiffs also claim that signing the Work with Minors Form would violate the Code of Ethics of the National Association of Social Workers. (Id. ¶ 180). The Code directs that "'social workers should not allow an employing organization's policies, procedures,

regulations or administrative orders to interfere with their ethical practice of social work.'" (Id.).

Pursuant to the Code, ethical practice of social work includes an obligation not to "'practice,

condone, facilitate, or collaborate with any form of discrimination on the basis of race, ethnicity,

sex, sexual orientation … marital status, political belief, [or] religion.'" (Id.).

G. Procedural History

Plaintiffs' original complaint contained claims pursuant to the federal and New York State

Constitutions, as well as state and local antidiscrimination laws.  Defendants brought motions to

dismiss that complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Before any adjudication of those

motions, plaintiffs received notice of their right-to-sue from the U.S. Equal Employment

Opportunity Commission and amended their complaint to include claims pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. [7]  The Court then denied defendants'

---

[7] The Amended Complaint alleges seventeen causes of action. They are brought: 1) against the Salvation Army for
violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; 2) against the
government defendants for violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S.
Constitution; 3) against the government defendants for violation of the Establishment Clause of the First Amendment to
the U.S. Constitution; 4) against the government defendants for violation of the Establishment Clause of the First
Amendment to the U.S. Constitution brought by plaintiffs as taxpayers; 5) against the Salvation Army for violation of
the Free Exercise Clause of the First Amendment to the U.S. Constitution; 6) against the Salvation Army for violation
of Section Eleven of Article I of the Constitution of New York State; 7) against the Salvation Army for violation of
Section Three of Article I of the Constitution of New York State; 8) against the government defendants for violation of
Section Eleven of Article I of the Constitution of New York State; 9) against the Salvation Army for discrimination in
violation of 42 U.S.C. §§ 2000e-2(a), (m); 10) against the Salvation Army for discrimination in violation of New York
Exec. L. § 296; 11) against the Salvation Army for discrimination in violation of New York City Admin. Code § 8-107;
12) against the Salvation Army for constructive termination in violation of 42 U.S.C. §§ 2000e-2(a), (m) on behalf of
plaintiffs Lown, Bielarski, Copes, Dessables, Geissman, Gorham, Inouye, Nikichin and Obermaier; 13) against the
Salvation Army for constructive termination in violation of New York Exec. L. § 296 on behalf of plaintiffs Lown,
Bielarski, Copes, Dessables, Geissman, Gorham, Inouye, Nikichin and Obermaier; 14) against the Salvation Army for
constructive termination in violation of New York City Admin. Code § 8-107(1)(a) on behalf of plaintiffs Lown,
Bielarski, Copes, Dessables, Geissman, Gorham, Inouye, Nikichin and Obermaier; 15) against the Salvation Army for
retaliation in violation of 42 U.S.C. § 2000e-3 on behalf of plaintiffs Lown and Geissman; 16) against the Salvation
Army for retaliation in violation of New York State Exec. L. § 296(7) on behalf of plaintiffs Lown and Geissman; 17)
against the Salvation Army for retaliation in violation of New York City Admin. Code § 8-107(7) on behalf of plaintiffs
Lown and Geissman.  (Am. Compl. ¶¶ 197-269).

motions to dismiss the original complaint as moot, and defendants brought the instant motions to dismiss the amended complaint.[8]

II. ANALYSIS

A. Standard

When reviewing a motion to dismiss for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6), a district court may only dismiss plaintiffs' claims if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Drake v. Delta Air Lines, Inc., 147 F.3d 169, 171 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) (quotation marks omitted). A court must treat all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v. Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).

"A complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Phillip v. Univ. of Rochester, 316 F.3d 291, 293 (2d Cir. 2003) (quoting Conley, 355 U.S. at 47); see also Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). The forgiving notice pleading rules "apply with particular stringency to complaints of civil rights violations." Phillip, 316 F.3d at 293-94.

B. The Government Defendants' Motion

Plaintiffs bring claims against the government defendants for alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, the Establishment Clause of the First Amendment to the U.S. Constitution and Article I, Section Eleven of the New York

---

[8] The Court declines defendant DeMarzo's request to convert the motion to dismiss the Amended Complaint into a motion for summary judgment pursuant to Fed. R. Civ. P. 56. The Court has not considered matters outside the pleadings and the motion is properly analyzed as one to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Constitution.  Because plaintiffs have failed to state a claim upon which relief can be granted with respect to all their claims other than their taxpayer-standing-based Establishment Clause claim, the government defendants' motion to dismiss the complaint is granted in part and denied in part.

1. Equal Protection

Plaintiffs have failed to state claims against the government defendants for allegedly violating the federal Equal Protection Clause and Article I, Section Eleven of the New York Constitution by supporting the Salvation Army, which was allegedly engaged in discrimination on the basis of religion.  The Amended Complaint does not contain allegations that the government defendants' respective decisions to fund SSC programs ran afoul of the Equal Protection Clause, nor that the employment practices of the Salvation Army may properly be attributed to the government defendants.

The Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Section 1983 grants plaintiffs a cause of action for violations of the Fourteenth Amendment.  42 U.S.C. § 1983.  It states, in pertinent part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"  Id.

The Equal Protection Clause prohibits the government from subjecting individuals to "selective treatment … based on impermissible considerations such as … religion."  Knight v. Conn. Dep't of Public Health, 275 F.3d 156, 166 (2d Cir. 2001) (quoting Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000) (quotation marks omitted)).  To state an Equal Protection Clause claim, plaintiffs must allege that the government decisionmakers acted with

discriminatory intent or purpose.  See Thomas v. City of New York, 143 F.3d 31, 37 (2d Cir. 1998) (affirming dismissal of an Equal Protection Clause claim when "plaintiffs did not allege sufficient facts to support discriminatory intent on the part of the legislature."); see also Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) ("[A] plaintiff pursuing a … denial of equal protection … must show that the discrimination was intentional."); Knight, 275 F.3d at 166 (2d Cir. 2001) (Plaintiffs must show "that the decisionmakers … acted with discriminatory purpose.") (quoting McCleskey v. Kemp, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)) (quotation marks omitted).

To plead intentional discrimination in violation of the Equal Protection Clause, a plaintiff must allege that the state expressly classified on the basis of a suspect characteristic, see Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000), applied a neutral program in an intentionally discriminatory manner, see id. (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S. Ct. 1064, 30 L. Ed. 220 (1886)), or promulgated a policy that was motivated by discriminatory animus and that had an adverse effect, see id. (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977), and Johnson v. Wing, 178 F.3d 611, 615 (2d Cir. 1999)).  Plaintiffs never allege that the government defendants expressly classified on the basis of religion, intended to discriminate, nor possessed animus in the execution of the contracts at issue.  Indeed, the contracts existed before the Salvation Army initiated the Reorganization Plan and they included provisions mandating that the Salvation Army not engage in unlawful employment discrimination.  (See Am. Compl. ¶ 62).  The absence of any allegations of impermissible intent or purpose, combined with allegations giving rise to the strong inference that the government defendants intended that the Salvation Army not discriminate, preclude plaintiffs' Equal Protection Claim against the government defendants.  See Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839, 869-70 (2d Cir. 1996) (holding that a public school permitting a religious

student club to discriminate on the basis of religion did not violate the Equal Protection Clause because "there is no invidious discrimination here….").

The absence of allegations that the government defendants engaged in intentional or purposeful discrimination also proves fatal to plaintiffs' claim pursuant to the New York Constitution.[9] See Hayut v. State Univ. of New York, 352 F.3d 733, 754-55 (2d Cir. 2003) (applying the same analysis to a claim pursuant to Article I, Section Eleven of the New York Constitution as to a claim pursuant to the federal Equal Protection Clause) (citing Brown v. State, 89 N.Y. 2d 172, 190, 652 N.Y.S. 2d 233, 674 N.E. 2d 1129 (1996)); Under 21 v. City of New York, 65 N.Y. 2d 344, 360 n.6, 492 N.Y.S. 2d 522, 482 N.E. 2d 1 (1985).

Plaintiffs claim that Norwood v. Harrison, 413 U.S. 455, 93 S. Ct. 2804, 37 L. Ed. 2d 723 (1973), supports their Equal Protection Clause claim because the case barred the government from providing material support to discriminatory organizations. Norwood held that the Equal Protection Clause prohibited the government from providing textbooks to private schools that engaged in racial discrimination. See id. Plaintiffs cite no cases applying the holding of Norwood to organizations that discriminate on the basis of religion. Indeed, the Norwood Court distinguished the case before it from others in which the government extended aid to religious schools because unlike discrimination on the basis of race to which the Constitution ascribes no value, discrimination on the basis of religion may stem from the right to free exercise, which is constitutionally protected. See id. at 469-70. The Court specifically noted that "the Constitution … places no value on [racial] discrimination as it does on the values inherent in the Free Exercise Clause." Id. Plaintiffs cannot lean on Norwood to support their Equal Protection claim.

_____

[9] Article I, Section Eleven of the New York State Constitution provides, in pertinent part:

> No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

The U.S. Supreme Court's decision in <u>Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos</u>, 483 U.S. 327, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987), further undercuts plaintiffs' Equal Protection Clause claim. The <u>Amos</u> Court rejected an Equal Protection challenge to Section 702 of the Civil Rights Act of 1964, a provision that exempts religious organizations from the antidiscrimination principle of Title VII when they discriminate on the basis of religion in employment. <u>See id.</u> The Court explained that "where a statute is neutral on its face and motivated by a permissible purpose…, we see no justification for applying strict scrutiny to [that] statute [if it] passes the <u>Lemon</u>[ v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971)] test [for gauging violations of the Establishment Clause]." <u>Amos</u>, 483 U.S. at 339. In its Equal Protection Clause analysis, the <u>Amos</u> Court subjected Section 702 to the forgiving rational basis review standard, merely requiring a showing of "a rational classification to further a legitimate end." <u>Id.</u>; <u>see also</u> <u>Locke v. Davey</u>, 540 U.S. 712, 720 n.3, 124 S. Ct. 1307, 158 L. Ed. 2d 1 (2004) ("Because we hold … that the program is not a violation of the Free Exercise Clause, however, we apply rational-basis scrutiny to [plaintiff's] equal protection claims."). Similarly here, the Equal Protection Clause does not dictate rigorous scrutinizing of the contracts. Rather, meaningful constitutional scrutiny of those contracts is properly carried out pursuant to the Establishment Clause. The contracts are religion-neutral, and they were executed for the permissible purpose of providing social services. Therefore, for Equal Protection Clause purposes, the contracts are subject to mere rational basis review, a degree of scrutiny they plainly survive.

Plaintiffs have alleged no facts suggesting that the government defendants' funding decisions constituted intentional discrimination, and have instead proffered facts suggesting that the government defendants intended that the Salvation Army not discriminate. Moreover, as discussed <u>infra</u>, the Salvation Army's allegedly purposeful discriminatory actions may not be ascribed to the government defendants. Accordingly, plaintiffs' claims pursuant to the Equal Protection Clause

and Article I, Section Eleven of the New York State Constitution against the government defendants are dismissed.[10]

2. Establishment Clause

The Establishment Clause of the First Amendment to the U.S. Constitution, which provides that "Congress shall make no law respecting an establishment of religion[,]" applies to the states through the Due Process Clause of the Fourteenth Amendment. See Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002); DeStefano v. Emergency Hous. Group, Inc., 247 F.3d 397, 405 (2d Cir. 2001). Plaintiffs allege that by funding the Salvation Army, the government defendants have violated the Establishment Clause. Before determining whether plaintiffs have satisfactorily stated a claim for violation of the Establishment Clause, the Court must ascertain whether plaintiffs have properly alleged standing.

a. Standing

The doctrine of standing reflects the jurisdictional limitation in Article III of the Constitution that federal courts may only hear "cases and controversies." The Supreme Court has interpreted Article III to impose three specific standing requirements that must be met before a federal court may exercise its jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); see also Baur v. Veneman, 352 F.3d 625, 631-32 (2d Cir. 2003). First, a plaintiff must have suffered "an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations and quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly …

---

[10] Federal courts lack jurisdiction to enjoin state officers from violating state law. See Miller v. French, 530 U.S. 327, 332, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (citing Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)); see also Bad Frog Brewery, Inc. v. New York State Liquor Auth., 134 F.3d 87, 93 (2d Cir. 1998). Therefore, insofar as plaintiffs' claim pursuant to Article I, Section Eleven of the New York Constitution is brought against defendants Maul and Novello, it would, in any event, be barred by the Eleventh Amendment.

trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." Id. at 560-61 (citation and internal quotation marks omitted) (bracketed text and ellipses in Lujan). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561 (citation and internal quotation marks omitted). The party invoking federal jurisdiction bears the burden of establishing each of these elements with "general factual allegations of injury resulting from the defendant's conduct." Id.

Here, plaintiffs bring two distinct Establishment Clause claims, both relating to the same conduct, namely defendants' provision of "funds to finance The Salvation Army's religious discrimination." (Am. Compl. ¶¶ 202-03). One of these claims, claim number three, does not assert a particular basis for plaintiffs' standing. The other, claim number four, is brought specifically in plaintiffs' capacity as taxpayers of all the relevant political subdivisions.

Ordinarily taxpayers do not have standing to challenge expenditures of government funds. See Frothingham v. Mellon, 262 U.S. 447, 43 S. Ct. 597, 67 L. Ed. 1078 (1923). In Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), the Supreme Court recognized an exception to that rule and permitted a taxpayer to bring an Establishment Clause action when there is "'a logical link between [his status as a taxpayer] and the type of legislative enactment attacked' as well as 'a nexus between that status and the precise nature of the constitutional infringement alleged.'" DeStefano, 247 F.3d at 405 (quoting Flast, 392 U.S. at 102) (bracketed text in DeStefano); see also Bowen v. Kendrick, 487 U.S. 589, 620, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988). Taxpayer standing can apply to challenges to administratively provided grants. See Bowen, 487 U.S. at 619.

In Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49 (2001), the United States Court of Appeals for the Second Circuit rejected the plaintiffs' attempt to exercise taxpayer standing in an Establishment Clause claim, because "what was required for the establishment of taxpayer standing

to complain of activities at [the schools at issue] was a showing of a measurable appropriation or loss of revenue attributable to the challenged activities at those schools." Id. at 74. The Altman Court explained that although a taxpayer plaintiff need not demonstrate a "likelihood that resulting savings will inure to the benefit of the taxpayer," she must show that the jurisdiction to which she pays taxes suffers a "measurable appropriation or loss of revenue[.]" See id. at 73 (quoting United States v. City of New York, 972 F.2d 464, 466, 470 (2d Cir. 1992)) (quotation marks omitted).

Here, plaintiffs have alleged that 10% – "the traditional religious tithe" – of the face value of SSC's government contracts has been diverted to the Salvation Army, which allegedly uses that money for religious purposes. (Am. Compl. ¶¶ 115, 118). That alleged diversion of funds is sufficient to confer taxpayer standing on plaintiffs. In addition, given that SSC is, according to plaintiffs, 95% funded by government sources, it is a fair inference that the Salvation Army's Reorganization Plan has compelled SSC to expend government-provided funds, or at least to use government-funded resources, in complying with its new religiously-oriented responsibilities. Plaintiffs therefore have standing to bring their Establishment Clause claim in their capacity as taxpayers, which is claim number four.

Plaintiffs' non-taxpayer standing Establishment Clause claim – claim number three – is duplicative of their taxpayer standing claim and is dismissed on that basis. Moreover, plaintiffs do not proffer any basis for different theories of standing supporting two independent causes of action, each of which is brought against the same defendants and seeks the same relief from the same conduct that allegedly violated the same law. See Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995). In addition, plaintiffs have failed to allege any concrete injury – other than that suffered in their capacity as taxpayers – that the government defendants have caused. See Lujan, 504 U.S. at 560-61. The Amended Complaint contains no allegations that the government defendants took any actions with immediate injurious impact on plaintiffs other than expending public funds in alleged

contravention of the Establishment Clause. That injury can be fully remedied by plaintiffs' claim as taxpayers.

In sum, plaintiffs have properly alleged that they possess taxpayer standing to pursue the Establishment Clause cause of action raised in their fourth claim for relief. Plaintiffs' additional Establishment Clause cause of action raised in their third claim for relief is unnecessarily duplicative and is dismissed on that basis.

### b. Stating an Establishment Clause Claim

The Court next turns to whether plaintiffs' surviving Establishment Clause cause of action states a claim upon which relief can be granted.

Government aid to religious organizations may not be diverted to religious uses. Justice O'Connor's concurrence in <u>Mitchell v. Helms</u>, 530 U.S. 793, 120 S. Ct. 2530, 147 L. Ed. 2d 660 (2000), which is controlling authority given that she concurred in the result on narrower grounds than those on which the plurality rested, <u>see</u> <u>DeStefano</u>, 247 F.3d at 418; <u>Gentala v. City of Tucson</u>, 244 F.3d 1065, 1076 (9th Cir.), <u>rev'd on other grounds</u>, 534 U.S. 946, 122 S. Ct. 340, 151 L. Ed. 2d 256 (2001); <u>Columbia Union Coll. v. Oliver</u>, 254 F. 3d 496, 504 (4th Cir. 2001); <u>Simmons-Harris v. Zelman</u>, 234 F.3d 945, 957 (6th Cir. 2000), <u>rev'd on other grounds</u>, 536 U.S. 639; <u>Am. Jewish Cong. v. Corp. for Nat'l and Cmty. Serv.</u>, 323 F. Supp. 2d 44, 59 (D. D.C. 2004), <u>rev'd on other grounds</u>, 399 F.3d 351 (D.C. Cir. 2005), expressly maintained the Supreme Court's historical prohibition on government directly providing funds to organizations that use those funds to support religious activity. <u>See</u> <u>Mitchell</u>, 530 U.S. at 854. Here there is an allegation that 10% of the contract funds have been commandeered to serve the religious mission of the Salvation Army Church. In light of the "'special Establishment Clause dangers where the government makes direct money payments to sectarian institutions[,]'" <u>Id.</u> at 843 (O'Connor, J., concurring) (quoting <u>Rosenberger v. Rectors and Visitors of the Univ. of Va.</u>, 515 U.S. 819, 842, 115 S. Ct. 2510, 132 L.

Ed. 2d 700 (1995)), that allegation is sufficient to enable plaintiffs' claim to survive the government defendants' motion to dismiss. <u>See</u> <u>DeStefano</u>, 247 F.3d at 416 (direct state funding of the inculcation of religious beliefs violates the Establishment Clause); <u>Freedom From Religion Found. v. McCallum</u>, 179 F. Supp. 2d 950, 968 (W.D. Wis. 2002). Moreover, as discussed above, it is a reasonable inference from the allegations in the Amended Complaint that government funds have been used in furtherance of SSC's compliance with the Reorganization Plan, particularly given that SSC is 95% funded by government sources and that its employees are paid virtually in full by government funds.

Plaintiffs have also alleged facts giving rise to the inference that the Salvation Army may be using government funds to support indoctrination of clients whom the government defendants compel to participate in SSC programs. Although plaintiffs have not specifically alleged instances of indoctrination, they have alleged tension between the professional responsibilities of plaintiffs – a number of whom are social workers – and the newly imposed duties of their employment. There have allegedly been threats of termination for failure to comply with demands that have been made in conjunction with the implementation of the One Army Concept. Plaintiffs claim that their professional obligations as social workers require them to be amenable to counselling clients on particular topics (such as safe sex, sexual orientation or substance abuse) that potentially conflict with the religious mission of the Salvation Army.

Whether and how the One Army Concept has influenced the content of SSC's social services will be revealed in discovery. If individuals who were involuntarily referred to SSC's programs were subjected to religious instruction, indoctrination, or practice, government support for those programs would raise a substantial Establishment Clause issue. <u>See</u> <u>DeStefano</u>, 247 F.3d at 416 ("As the Supreme Court has repeatedly held, one of the few absolutes in Establishment Clause jurisprudence is the 'prohibit[ion against] government-financed or government-sponsored

indoctrination into the beliefs of a particular religious faith.'") (quoting <u>Bowen</u>, 487 U.S. at 611)

(quoting <u>Grand Rapids Sch. Dist. v. Ball</u>, 473 U.S. 373, 385, 105 S. Ct. 3216, 87 L. Ed. 2d 267

(1985)); <u>Warner v. Orange County Dep't of Probation</u>, 115 F.3d 1068, 1075 (2d Cir. 1997) (noting

the "'fundamental limitation[] imposed by the Establishment Clause' that bars government from

'coerc[ing] anyone to support or participate in religion or its exercise.'") (quoting <u>Lee v. Weisman</u>,

505 U.S. 577, 587, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992)) (brackets in <u>Warner</u>).[11] <u>Cf.</u> <u>Zelman</u>,

536 U.S. at 649 (explaining that it is permissible for government-funded vouchers to be redeemed at

religious schools when private individuals make the independent choice of where to use the

vouchers and the government remains neutral with respect to where the vouchers are used).

Of plaintiffs' claims against the government defendants, only their Establishment Clause

claim brought as taxpayers survives this motion to dismiss the Amended Complaint. Plaintiffs'

Establishment Clause claim that is their third claim for relief is dismissed because it is duplicative.

Plaintiffs' claims pursuant to the Equal Protection Clause and Article I, Section Eleven of the New

York Constitution are dismissed for failure to allege that the government defendants engaged in

intentional discriminatory conduct.

<u>C. The Salvation Army's Motion</u>

Plaintiffs have brought federal and state constitutional claims, as well as federal, state and

local statutory claims against the Salvation Army. As have the government defendants, the

Salvation Army has moved to dismiss all claims against it. The Court turns first to the

constitutional claims against the Salvation Army.

---

[11] The Court is mindful that "it is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is 'religiously inspired.'" <u>Bowen v. Kendrick</u>, 487 U.S. 589, 621, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988). <u>Bowen</u> did make clear, however, that "it would be unconstitutional for federal aid recipients to participate in 'specifically religious activities' or 'to use materials that have an explicitly religious content or [that] are designed to inculcate the views of a particular religious faith.'" <u>DeStefano v. Emergency Housing Group, Inc.</u>, 247 F.3d 397, 411 (2d Cir. 2001) (quoting <u>Bowen</u>, 487 U.S. at 621). The content of SSC's government-funded social services cannot be appreciated from the spartan record at this stage of the litigation. <u>See</u> <u>Bowen</u>, 487 U.S. at 621-22 (remanding to the district court for a determination of whether aid had been used to fund "specifically religious activit[ies]").

1. Constitutional Claims Against The Salvation Army

Plaintiffs' federal constitutional claims against the Salvation Army specifically charge violation of the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs' state constitutional claims assert violations of Sections Three and Eleven of Article I of the New York Constitution.  Because plaintiffs have not properly alleged state action, their claims pursuant to the Free Exercise Clause, the Equal Protection Clause and Article I, Section Eleven of the New York Constitution are dismissed.  In addition, plaintiffs' claim pursuant to Article I, Section Three of the New York Constitution is dismissed because plaintiffs have failed to allege the denial of a cognizable civil right.

a. Federal Constitutional Claims

Plaintiffs contend that the Salvation Army's allegedly discriminatory practices violated the Free Exercise Clause and the Equal Protection Clause.  In conjunction with the Establishment Clause, the Free Exercise Clause reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"  U.S. Const. amend. I.  The Fourteenth Amendment incorporates the Free Exercise Clause, making it applicable to the states.  See Elk Grove Unified Sch. Dist. v. Nedow, 542 U.S. 1, -- n.4, 124 S. Ct. 2301, 2307 n.4, 159 L. Ed. 2d 98 (2004).  The Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  The Free Exercise Clause and the Equal Protection Clause apply only to state action.  See United States v. Morrison, 529 U.S. 598, 621, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (referring to the "time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action"); Genas v. State of N.Y. Dep't of Corr. Servs., 75 F.3d 825, 831 (2d Cir. 1996) ("To prevail on his Free Exercise claim, [plaintiff] must first show that a state action sufficiently burdened his exercise of religion"); Hussein v. Waldorf Astoria Hotel, Rest. and Club Employees and Bartenders Local #6,

No. 99 Civ. 1652, 2000 WL 16928, at *2 (S.D.N.Y. Jan. 11, 2000) (noting that the First Amendment does not prohibit restrictive behavior by private entities unless there is a proper showing of state action)

Thus, to hold the Salvation Army – a private entity – liable pursuant to these constitutional provisions, plaintiffs must allege facts suggesting that the Salvation Army was engaged in state action. The determination of whether a private entity acted as the state is a "necessarily fact-bound inquiry." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 298, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (quotation marks and citation omitted). The first step of the inquiry is "identifying the specific conduct of which the plaintiff complains." Tancredi v. Met. Life. Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003) (quoting American Mfg. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)) (quotation marks omitted). Here, the relevant specific conduct is SSC's allegedly discriminatory personnel policies.

For SSC's personnel policies to be properly characterized as state action, plaintiffs must claim "both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation must be a person who may fairly be said to be a state actor." Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 111 (2d Cir. 2003) (emphases in original) (quotation marks and citation omitted).

The second element of that showing requires plaintiffs to demonstrate that the relevant conduct was "fairly attributable to the state…." Id. (quotation marks and citation omitted). "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Flagg v. Yonkers Sav. and Loan Ass'n, 396 F.3d 178, 187 (2d Cir. 2005) (quoting Cranley, 318 F.3d at 111) (quotation marks omitted). "A nexus of 'state action' exists

between a private entity and the state when 'the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies.'" Id. (quoting Cranley, 318 F.3d at 112) (quotation marks and alterations omitted). The close nexus requirement is meant to "assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." Cranley, 318 F.3d at 111 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)) (emphasis in original); see also Horvath v. Westport Library Ass'n, 362 F.3d 147, 154 (2d Cir. 2004).

Plaintiffs never allude to any state actor participating in the Salvation Army's allegedly discriminatory practices. Rather, plaintiffs suggest two bases for construing the Salvation Army's conduct as state action. First, that the Salvation Army performs government functions and second, that it is so interconnected with the government defendants when offering social services that its actions can be attributed to the government defendants. In response, the Salvation Army insists that it does not act as an arm of the state when managing its workforce.

In setting and implementing internal employment policies, the Salvation Army does not perform a governmental function that warrants an inference of state action. "[T]he relevant question is not simply whether a private group is serving 'a public function[,]'" Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982), but rather "whether the function performed has been 'traditionally the exclusive prerogative of the State.'" Id. (emphasis in original) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 353, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974)); see also Doe v. Harrison, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003). Personnel

management is plainly not traditionally within the exclusive province of the state, see Rendell-Baker, 457 U.S. at 840; see also Tancredi, 316 F.3d at 313 ("The management of a corporation is not a public function…."), and is not properly considered "'a function traditionally associated with sovereignty.'" Horvath, 362 F.3d at 152 (quoting Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa., 545 F.2d 382, 383 (3d Cir. 1976)). It is of no moment that some of the relevant employees may have been hired to provide services that have traditionally been exclusively provided by the state, because the Court must evaluate whether the Salvation Army engaged in state action with respect to the specific conduct of which plaintiffs complain, namely, allegedly discriminatory employment practices. See Tancredi, 316 F.3d at 312.

Plaintiffs have also failed to allege facts suggesting that the personnel decisions of the Salvation Army may be reasonably attributed to the government defendants. "'[M]ere approval or acquiescence'" on the part of the government defendants does not amount to state action. Cranley, 318 F.3d at 112 (quoting American Mfg. Mut. Ins., 526 U.S. at 52); see also Tancredi, 318 F.3d at 313 ("State approval of an action by a regulated entity does not constitute state action 'where the initiative comes from [the private entity] and not from the State' and the state 'has not put its own weight on the side of the proposed practice by ordering it'")(quoting Jackson, 419 U.S. at 357) (bracketed text in Tancredi). In Rendell-Baker v. Kohn, the Supreme Court determined that the decision of a private school to fire employees did not constitute state action even though the school – which received between 90% and 99% of its budget from the state funding – was subject to state regulation and had contracted with the state to perform a service that the state was required by law to provide. See 457 U.S. at 832-33. The Second Circuit has explained that in Rendell-Baker, "[t]he decisive factor in the [Supreme] Court's view was that the school's personnel decisions were uninfluenced by public officials and that 'the decisions to discharge the petitioners were not compelled or even influenced by any state regulation.'" Horvath, 362 F.3d at 152.

The Amended Complaint recounts that SSC is regulated by and cooperates extensively with the government defendants when providing social services. Those facts alone do not, however, result in a "sufficiently close nexus" between the government defendants' conduct and SSC's alleged discriminatory employment practices "so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. at 351. Plaintiffs proffer no allegations indicating that the state had any role whatsoever in the development or effectuation of the Salvation Army's allegedly discriminatory policies. See Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 527 (2d Cir. 1996) (Employment decisions of contractor that provides medical services to inmates in a city jail are not state action); Alcena v. Raine, 692 F. Supp. 261, 267 (S.D.N.Y. 1988) ("There is no basis to impute the actions of the private defendants to the state as there is no evidence the state has intruded into or was even interested in the challenged personnel decisions."); see also Rendell-Baker, 457 U.S. at 841-42 (finding no state action in the termination of a school employee when "the various regulators showed relatively little interest in the school's personnel matters[ ]"); Blum, 457 U.S. at 1011-12 (concluding that even when nursing homes are heavily regulated and supported by government funds, their decisions to discharge or transfer Medicaid patients to lower levels of care are not state actions when the government did not take an active role in the specific decisions). Moreover, plaintiffs allege that the government defendants' contracts with SSC mandated that it refrain from engaging in illegal employment discrimination. (Am. Compl. ¶ 62). Accordingly, the Salvation Army's alleged employment discrimination cannot properly "be fairly treated as that of the State itself." Jackson, 419 U.S. at 351.

In certain circumstances, a private organization may be so entwined with government that its conduct may be deemed per se state action. See Brentwood Acad., 531 U.S. 288; Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 115 S. Ct. 961, 130 L. Ed. 2d 902 (1995). "That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the

relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor." Horvath, 362 F.3d at 154 (quoting Brentwood Acad., 531 U.S. at 303). For example, in Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, the Supreme Court considered a high school athletic association to be a state actor because it was overwhelmingly controlled by public officials acting in their official capacities, and because its staff was eligible for certain public employee benefits. See Brentwood, 531 U.S. at 299-300. That "pervasive entwinement" meant that the association's actions were state actions. Id. at 291. Plaintiffs have failed to allege that the Salvation Army possesses the type of relationship with any government entity that would support a finding of "pervasive entwinement." The Amended Complaint does not contain allegations that any government agents held positions of authority within the hierarchy of the Salvation Army, nor that public employee benefits are available to Salvation Army employees.

Because the allegedly discriminatory acts of the Salvation Army cannot properly be considered state action, plaintiffs' claims against the Salvation Army for violation of the Equal Protection Clause and the Free Exercise Clause are dismissed.

### b. State Constitutional Claims

Plaintiffs' failure to allege state action and their failure to identify a civil right of which they were deprived prove fatal to their claims pursuant to Article I of the New York Constitution. Section Eleven of Article I has two provisions, an equal protection provision and an antidiscrimination in civil rights provision. Equal protection claims pursuant to Section Eleven are analyzed similarly to federal Equal Protection Clause claims. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 754-55 (2d Cir. 2003) (citing Brown v. State, 89 N.Y.2d 172, 190, 652 N. Y. S. 2d 223, 674 N.E. 2d 1129 (1996) (citation omitted)). Plaintiffs must allege state action. See People v. Kern, 75 N.Y. 2d 638, 653, 554 N.E. 2d 1235, 555 N.Y.S. 2d 647 (1990) ("[O]ur State equal

protection provision, like the Federal equal protection right, is directed at discrimination attributed to the government and requires a showing of 'State action'"); Under 21 v. City of New York, 65 N.Y.2d 344, 360 n.6, 492 N.Y.S. 2d 522, 482 N.E. 2d 1 (1985) ("[T]he State constitutional equal protection clause (N.Y. Const., art. I, § 11) is no broader in coverage than the Federal provision and this equation with the Federal provision extends to the requirement of 'State action' in order for the equal protection clause to be applicable") (citation omitted). As plaintiffs have failed to allege state action, their state equal protection claim is dismissed.

Section Eleven also includes a Civil Rights Clause that bars discrimination in the exercise of civil rights. It provides: "No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, institution, or by the state or any agency or subdivision of the state." N.Y. Const. art. I, § 11. The Civil Rights Clause does not contain a state action requirement. Kern, 75 N.Y. 2d at 651. "The Civil Rights Clause is not self-executing, however, and prohibits discrimination only as to civil rights which are 'elsewhere declared' by Constitution, statute, or common law." Id. Freedom from religious discrimination in employment by a religious organization is not a civil right "elsewhere declared." Indeed, as discussed infra, federal, state and local statutory provisions expressly permit religious organizations to discriminate on the basis of religion in employment. Thus, plaintiffs have failed to allege that they were denied a civil right protected by the Civil Rights Clause of the New York Constitution.

Section Three of Article I of the New York Constitution guarantees the right to free exercise of religion: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind…." Unlike the federal Free Exercise Clause, Section Three does not explicitly restrict its application to government action. Nevertheless, plaintiffs have cited no cases employing Section Three to constrain private

conduct. By contrast, several New York courts have held that Section Three only pertains to state action. See Trietley v. Bd. of Ed. Of City of Buffalo, 65 A.D. 2d 1, 8, 409 N.Y.S. 2d 912 (N.Y. App. Div. 4th Dep't 1978) (requiring a showing of coercive governmental activity for a free exercise claim pursuant to Section Three of Article I of the New York State Constitution), abrogated on other grounds by Good News Club v. Milford Cent. Sch., 533 U.S. 98, 107 n.2, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001); Carr v. St. John's Univ., 34 Misc. 2d 319, 323, 231 N.Y.S. 2d 403 (S. Ct. Kings Co.), rev'd on other grounds, 17 A.D. 2d 632, 231 N.Y.S.2d 410 (2d Dep't), aff'd 12 N.Y.2d 802, 235 N.Y.S. 2d 834, 187 N.E.2d 18 (1962); Zlotowitz v. Jewish Hosp., 193 Misc. 124, 126, 84 N.Y.S. 2d 61 (S. Ct. N.Y. Co. 1948), aff'd, 277 A.D. 974, 100 N.Y.S.2d 226 (1st Dep't 1950). This Court declines the invitation to blaze a new trail in New York constitutional jurisprudence by construing Section Three to apply to private action. Therefore, plaintiffs' state free exercise claim fails for absence of allegations of state action.

2. Employment Discrimination Claims

In addition to their constitutional claims, plaintiffs have brought statutory discrimination claims against the Salvation Army pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq., New York Executive Law Section 296 and New York City Administrative Code Section 8-107. Specifically, plaintiffs contend that the Salvation Army discriminated against them on the basis of religion in its employment practices, created a hostile work environment and retaliated against them for their complaints about defendant's policies in violation of 42 U.S.C. § 2000e-2(a), (m), N.Y. Exec. L. §296(1)(a) and N.Y.C. Admin. Code § 8-107(1)(a). Nine plaintiffs – Lown, Bielarski, Copes, Dessables, Geissman, Gorham, Inouye, Nikichin and Obermaier – claim the hostile work environment was sufficiently severe to lead to their constructive termination.

The Salvation Army maintains that it is exempted from the relevant federal, state and local antidiscrimination laws by specific statutory exceptions. See 42 U.S.C. § 2000e-1(a) (the "federal

exception"); N.Y. Exec. L. § 296 (11) (the "state exception"); N.Y.C. Admin Code 8-107(12) (the "city exception").  Each of the exceptions permits religious organizations to advance their religious missions by discriminating on the basis of religion in employment.  The Amended Complaint concedes that the Salvation Army is a religious organization within the contemplation of the exceptions.  (See, e.g., Am. Compl. ¶ 51); see also McClure v. Salvation Army, 460 F.2d 553, 554 (5th Cir. 1972) ("The Salvation Army is a church….").  Nevertheless, plaintiffs maintain that the exceptions should either be construed so as not to apply to the circumstances at bar or, in the alternative, that the exceptions are unconstitutional as applied.

The broad language of the federal exception bars all of plaintiffs' Title VII claims.  The narrower language of the state and city exceptions precludes plaintiffs' discrimination claims, but not their retaliation claims.  Application of none of the exceptions runs afoul of the Constitution.  Therefore, plaintiffs' statutory employment discrimination claims against the Salvation Army are dismissed, except for their retaliation claims pursuant to state and city law.

a. Federal Employment Discrimination Claim

Title VII ordinarily proscribes religious discrimination in employment.  See 42 U.S.C. § 2000e-2(a).  Section 702 of Title VII, codified at 42 U.S.C. § 2000e-1(a), provides that that prohibition does not apply to religious organizations discriminating on religious grounds in employment.  As originally enacted, Section 702 afforded religious organizations an exception to the application of Title VII only insofar as they discriminated on the basis of religion in personnel decisions related to carrying out their religious activities.[12]  See Corp. of the Presiding Bishop of the

_____

[12] The original version of Section 702 provided in pertinent part as follows:

> This subchapter shall not apply … to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities….

33

Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 334 n.9, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987).  That limited exception complied with the so-called "Ministerial Exception," a doctrine interpreting the Free Exercise Clause to require that religious organizations be permitted to discriminate on the basis of religion when hiring individuals who perform religious functions.  See Kraft v. Rector, Churchwardens, and Vestry of Grace Church in N.Y., No. 01-CV-7871, 2004 WL 540327, at *4 (S.D.N.Y. Mar. 17, 2004); Gellington v. Christian Methodist Episcopal Church, 203 F.3d 1299, 1301-04 (11th Cir. 2000); Combs v. Central Tex. Ann. Conf. United Methodist Church, 173 F.3d 343, 345-51 (5th Cir. 1999); EEOC v. Catholic Univ. of Am., 83 F.3d 455, 461-65 (D.C. Cir. 1996); Young v. N. Ill. Conf. of United Methodist Church, 21 F.3d 184, 187-88 (7th Cir. 1994); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 362-63 (8th Cir. 1991); Natal v. Christian & Missionary Alliance, 878 F.2d 1575, 1577-78 (1st Cir. 1989); Hutchinson v. Thomas, 789 F.2d 392, 396 (6th Cir. 1986); Rayburn v. Gen. Conf. of Seventh-day Adventists, 772 F.2d 1164, 1172 (4th Cir. 1985).

In 1972, Congress amended Section 702 to provide religious organizations broader protection than that implicated by the Ministerial Exception.  The amended version of Section 702 reads in pertinent part

> This subchapter shall not apply to an employer with respect to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).  This revised language applied Section 702's exemption to any activities of religious organizations, regardless of whether those activities are religious or secular in nature.

---

Pub. L. No. 88-352, 78 Stat. 255, formerly codified at 42 U.S.C. § 2000e-1 (1964), quoted in Amos v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 594 F. Supp. 791, 799 (D. Utah 1984) (emphasis in Amos), rev'd, 483 U.S. 327, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987).

In <u>Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos</u>,

483 U.S. 327, the Supreme Court considered and rejected a constitutional challenge to the

application of Section 702 when a religious organization discriminated against employees who

perform secular functions. The lead plaintiff in <u>Amos</u> worked at the Deseret Gymnasium, a non-

profit facility that was open to the public, but run by affiliates of the Church of Jesus Christ of

Latter-day Saints. <u>See</u> <u>id.</u> at 330. After working at the gymnasium for sixteen years as a building

engineer, the lead plaintiff was terminated because he failed to receive a certificate of membership

in the Church. <u>Id.</u> Section 702 absolved the Church of liability for dismissing the lead plaintiff and

the Supreme Court confronted the question of whether Section 702 went too far in accommodating

the free exercise interests of religious organizations so as to contravene the Establishment Clause.

The <u>Amos</u> Court applied the test of <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d

745 (1971), which requires that "'a statute or practice which touches upon religion, if it is to be

permissible under the Establishment Clause, must have a secular purpose; it must neither advance

nor inhibit religion in its principal or primary effect; and it must not foster an excessive

entanglement with religion.'" <u>DeStefano v. Emergency Hous. Group, Inc.</u>, 247 F.3d 397, 406 (2d

Cir. 2001) (quoting <u>County of Allegheny v. Am. Civil Liberties Union, Pittsburgh Chapter</u>, 492

U.S. 573, 592, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989) (citing <u>Lemon</u>, 403 U.S. at 612-13)). The

Supreme Court held that Section 702's shielding of the Church from liability for the discharge did

not violate the Establishment Clause. <u>Amos</u>, 483 U.S. at 330. To use an oft-cited phrase, the

application of Section 702 was situated within the "room for play in the joints between the Free

Exercise and Establishment Clauses[ that] allow[s] the government to accommodate religion

beyond free exercise requirements without offense to the Establishment Clause." <u>Cutter v.</u>

<u>Wilkinson</u>, 544 U.S. ---, 125 S. Ct. 2113, 2117, 161 L. Ed. 2d 1020, No. 03-9877, 2005 WL

1262549, at * 3 (May 31, 2005) (quoting <u>Locke v. Davey</u>, 540 U.S. 712, 718, 124 S. Ct. 1307, 158

L. Ed. 2d 1 (2004) (quoting Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 669, 90 S.

Ct. 1409, 25 L. Ed. 2d 697 (1970)))(quotation marks omitted).

In Amos, the Supreme Court explained that the purpose prong of the Lemon test is violated

when a governmental decisionmaker "abandon[s] neutrality and act[s] with the intent of promoting

a particular point of view in religious matters." 483 U.S. at 335. By contrast, Section 702 was

meant to advance "a permissible legislative purpose to alleviate significant governmental

interference with the ability of religious organizations to define and carry out their religious

missions." Id. The Court explained the burden on religious organizations that Section 702 was

intended to mitigate as follows:

> We may assume for the sake of argument that the pre-1972 exemption was adequate
> in the sense that the Free Exercise Clause required no more. Nonetheless, it is a
> significant burden on a religious organization to require it, on pain of substantial
> liability, to predict which of its activities a secular court will consider religious. The
> line is hardly a bright one, and an organization might understandably be concerned
> that a judge would not understand its religious tenets and sense of mission. Fear of
> potential liability might affect the way an organization carried out what it understood
> to be its religious mission.

Id. at 336. The Court concluded that Section 702 was enacted with the permissible purpose of

freeing religious organizations from fear of liability that might otherwise interfere with how they

realize their religious objectives. Id.

The Court in Amos next turned to the second Lemon requirement, namely that a challenged

governmental action must have "'a principal or primary effect … that neither advances nor inhibits

religion.'" Id. (quoting Lemon, 403 U.S. at 612) (ellipses in Amos). The Court rejected the opinion

of the district court, which considered Section 702 to have an improper effect when applied to

secular employees. Id. at 337-38. The district court had feared that Section 702 "would permit

churches with financial resources impermissibly to extend their influence and propagate their faith

by entering the commercial, profit-making world." Id. at 337. The Supreme Court maintained that

the district court's apprehension was not justified based on the record in Amos, which involved the

operation of a gymnasium, "a nonprofit activity instituted over 75 years ago…."  Id.  The Court

went on to explain that in any event:

> we find no persuasive evidence in the record before us that the Church's ability to
> propagate its religious doctrine through the Gymnasium is any greater now than it
> was prior to the passage of the Civil Rights Act in 1964.  In such circumstances, we
> do not see how any advancement of religion achieved by the Gymnasium can be
> fairly attributed to the Government, as opposed to the Church.

Id.  Therefore, the Court held that Section 702 did not have an unconstitutional effect.  See id. at

338.

Lastly, the Court in Amos applied the third Lemon requirement – that the challenged action

not excessively entangle church and state.  The Court rejected any challenge on the basis of

entanglement because Section 702 effects "a more complete separation" between the government

and religion, by avoiding "the kind of intrusive inquiry into religious belief that the District Court

engaged in in this case."  Id. at 339.

Following Amos, in Agostini v. Felton, 521 U.S. 203, 117 S. Ct. 1997, 138 L. Ed. 2d 391

(1997), the Supreme Court folded the third Lemon requirement into the second, considering

potential entanglement to be an element of the effect of a challenged action.  See DeStefano, 247 F.

3d at 406; see also Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 122 S. Ct. 2460, 153 L. Ed.

2d 604 (2002).  The Lemon test as modified by Agostini (the "Lemon / Agostini test") continues to

be the governing law in this Circuit with respect to Establishment Clause analyses.  See DeStefano,

247 F.3d at 405.  When determining whether a challenged action has an impermissible effect of

advancing or inhibiting religion, courts are to focus on three central points of inquiry: "whether the

action or program result[s] in governmental indoctrination; define[s] its recipients by reference to

religion; or create[s] an excessive entanglement."  Id. at 406 (citation and internal quotation marks

omitted) (bracketed text in DeStefano).  "These same factors can in most situations be evaluated to

answer what is often thought to be a separate question, whether a practice amounts to an

unconstitutional government 'endorsement' of religion." <u>Id.</u> (citing <u>Agostini</u>, 521 U.S. at 235;

<u>Mitchell v. Helms</u>, 530 U.S. 793, 120 S. Ct. 2530, 147 L. Ed. 2d 660 (2000) (O'Connor, J.,

concurring in the judgment)).

The Supreme Court has determined that Congress acted with permissible purpose in

enacting Section 702. <u>See</u> <u>Amos</u>, 483 U.S. at 336. Because the statute is applied neutrally to all

religious organizations, there is nothing in the instant application that implicates an impermissible

purpose. Therefore, as in <u>Amos</u>, Section 702 satisfies the purpose prong of the <u>Lemon</u> test. <u>See</u> <u>id.</u>

This Court's inquiry must focus on the second element of the <u>Lemon</u> / <u>Agostini</u> test –

whether the challenged action has the primary effect of advancing or inhibiting religion. Plaintiffs

claim that if Section 702 protects the Salvation Army from liability here, there will be an

impermissible advancement of religion, because the Salvation Army receives government funding,

and because it administers programs that individuals are compelled to attend. Neither of these

proffered grounds supports a conclusion that the application of Section 702 would have an

unconstitutional effect.

Plaintiffs urge that Section 702 is transformed from a permissible accommodation of

religion into an impermissible advancement of religion, because the Salvation Army has allegedly

discriminated against plaintiffs, whose salaries are paid with funds derived from government

contracts. <u>See</u> <u>Dodge v. Salvation Army</u>, No. S88-0353, 1989 WL 53857 (S.D. Miss. Jan. 9, 1989).

Plaintiffs contend that religious organizations that provide government-funded social services

forfeit the free exercise interests that underlay the Supreme Court's reasoning in <u>Amos</u>.

"It has long been established … that the State may sent a cleric, even a clerical order, to

perform a wholly secular task." <u>Roemer v. Bd. of Pub. Works of Md.</u>, 426 U.S. 736, 745-46, 96 S.

Ct. 2337, 49 L. Ed. 2d 179 (1976); <u>see also</u> <u>Bowen v. Kendrick</u>, 487 U.S. 589, 640-41, 108 S. Ct.

2562, 101 L. Ed. 2d 520 (1988) (Blackmun, J., dissenting); <u>Bradfield v. Roberts</u>, 175 U.S. 291, 298-

300, 20 S. Ct. 121, 44 L. Ed. 2d 168 (1899).  The notion that the Constitution would compel a religious organization contracting with the state to secularize its ranks is untenable in light of the Supreme Court's recognition that the government may contract with religious organizations for the provision of social services.  <u>See</u> <u>Bowen</u>, 487 U.S. at 609 ("[T]his Court has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs."); <u>see also</u> <u>Mitchell</u>, 530 U.S. at 827-29, (opinion of Thomas, J. for the plurality) (rejecting the notion that pervasively sectarian institutions are subject to a presumption of religious indoctrination, and that they are therefore ineligible to administer government funded programs).[13]

Religious organizations undoubtedly forfeit certain free exercise interests when they agree to provide social services on behalf of the government.  For example, the Establishment Clause requires that such organizations not possess unfettered discretion over the content of the services provided with public funds.  <u>See, e.g.</u>, <u>Bowen</u>, 487 U.S. at 621.  Nevertheless, the Establishment Clause does not mandate that such organizations abandon all free exercise interests.  Nothing in the Constitution precludes Congress from accommodating the Salvation Army's residual free exercise interest in selecting and managing its employees with reference to religion.[14]

In <u>Amos</u>, the Supreme Court considered the contemporary version of Section 702 a permissible accommodation of religion because it relieved religious organizations from the burden

_____

[13] Pursuant to the "pervasively sectarian" doctrine, government aid violates the Establishment Clause "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission…."  <u>Bowen v. Kendrick</u>, 487 U.S. 589, 610, 108 S. Ct. 2562, 101 l. Ed. 2d 520 (1988) (quoting <u>Hunt v. McNair</u>, 413 U.S. 734, 743, 93 S. Ct. 2868, 37 L. Ed. 2d 923 (1973)) (quotation marks omitted).  The current status of the pervasively sectarian doctrine is uncertain.  It has never been overruled, yet a plurality of the Court rejected it in <u>Mitchell v. Helms</u>, 530 U.S. 793, 827-29, 120 S. Ct. 2530, 147 L. Ed. 2d 660 (2000).  In any event, if the Salvation Army were constitutionally proscribed from providing social services by virtue of being pervasively sectarian, that fact would only be relevant to plaintiffs' Establishment Clause claim against the government defendants, not to plaintiffs' claim that Section 702 should not be applied to the Salvation Army.

[14] This is not to imply that the Constitution forbids Congress from imposing a universally applicable, neutral rule that government contractors not discriminate on the basis of religion.  <u>See</u> <u>Employment Div. v. Smith</u>, 494 U.S. 872, 882, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).

of having to predict which of their activities a court would consider religious and which it would

not.  See 483 U.S. at 336.  Plaintiffs contend that that burden is not at play when a religious

organization accepts government contracts, because the services it provides must be secular.

However, plaintiffs fail to perceive the distinction between objectively secular activities on the one

hand, and the subjectively religious inspiration that may motivate someone to perform those

activities on the other.  See Amos, 483 U.S. at 344 (Brennan, J., concurring) ("Churches often

regard the provision of [community] services as a means of fulfilling religious duty and of

providing an example of the way of life a church seeks to foster").  Just because the Constitution

may require that the content of government-funded services be secular does not mean that the

providers cannot feel a sense of spiritual fulfillment in providing them.  See Bowen, 487 U.S. at 641

(Blackmun, J., dissenting) (Government may "enlist[ ] the aid of religiously committed individuals

or organizations without regard to their sectarian motivation.").  Absent Section 702's broad

liability shield against religious discrimination in employment for all activities – religious or secular

– religious organizations providing government services would still be forced to predict whether

secular courts would recognize the potential religious significance of providing even secular

services.  That in turn has the potential to impact how religious organizations carry out their

religious missions.  See Amos, 483 U.S. at 336.  Therefore, contrary to plaintiffs' argument, Section

702 remains a permissible accommodation of free exercise interests rather than an impermissible

advancement of religion.

Any impermissible advancement of religion in this action derives from the government

defendants' support for the Salvation Army's programs – which may or may not prove to violate the

Establishment Clause as this litigation unfolds – not from the broadly applicable exception to Title

VII contained in Section 702.  Thus, the proper touchstone for this Establishment Clause analysis is

not how Section 702 permits the Salvation Army to interact with its employees, but rather the

content of the services that the government makes available through the Salvation Army. Establishment Clause concerns are implicated by government actions that directly advance religion, not by government actions that merely accommodate the free exercise interests of religious organizations.  See Amos, 483 U.S. at 337.  The Amos Court explained that "[f]or a law to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." Id. (emphasis in original).  The Court continued by explaining that establishment is caused by "'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" Id. (quoting Waltz v. Tax Comm'n of the City of New York, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970)).  To the extent such active support or sponsorship is at issue, it arises in the context of the government defendants' contracts with the Salvation Army – which will be reviewed through plaintiffs' Establishment Clause claim against the government defendants – not in the context of the application of Section 702, which accommodates the free exercise interests of the Salvation Army.  See id.

A religious organization that receives federal funds is not required to waive its eligibility for Section 702 protection.  See Hall v. Baptist Mem'l Health Care Corp., 215 F.3d 618, 625 (6th Cir. 2000); Young v. Shawnee Mission Med. Ctr., Civ. A. No. 88-2321-S, 1988 U.S. Dist. LEXIS 12248, at *4-5 (D. Kan. Oct. 21, 1988); see also Little v. Wuerl, 929 F.2d 944, 951 (3d Cir. 1991). Section 702 does not advance religion – as opposed to merely accommodating it – because a covered religious organization accepts public funds.

Plaintiffs' second ground for distinguishing Amos is that the government defendants compel individuals to participate in certain social programs that SSC administers.  The fact that the government defendants assign individuals to SSC programs may be relevant to the Court's Establishment Clause review of the government defendants' actions.  See Warner v. Orange County Dep't of Probation, 115 F.3d 1068 (2d Cir. 1997).  It is not similarly relevant, however, to the

application of Section 702. As discussed above, the facts alleged in the Amended Complaint give rise to an Establishment Clause concern regarding the manner in which SSC delivers social services on behalf of the government, but not a similar concern regarding how Section 702 permits the Salvation Army to interact with the employees who provide those services.

Plaintiffs are unable to distinguish Amos meaningfully. Section 702 continues to be a permissible accommodation of religion rather than "an unlawful fostering of religion." Amos, 483 U.S. at 334-35 (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 145, 107 S. Ct. 1046, 94 L. Ed. 2d 190 (1987)). Given the facts alleged in the Amended Complaint, Section 702 fits within the constitutionally permissible interstice at the juncture of the Free Exercise and Establishment Clauses. See Cutter, 125 S. Ct. at 2117, 2005 WL 1262549, at * 3.

Plaintiffs urge that the combination of circumstances at issue in this action raises the prospect of endorsement of religion in violation of the Establishment Clause. The Supreme Court has recognized that the government violates the Establishment Clause when it "sends a message of 'endorsement' of one religion over another." DeStefano, 247 F.3d at 410 (citing inter alia Lee v. Weisman, 505 U.S. 577, 604, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992) (Blackmun, J. concurring)); see also Lynch v. Donnelly, 465 U.S. 668, 688-89, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J. concurring in the judgment). The Second Circuit has explained, however, that in recent Supreme Court decisions, "the 'endorsement' inquiry has been subsumed under the Lemon-Agostini framework such that analysis of the criteria for determining a practice's primary effect also resolves any endorsement challenge." DeStefano, 247 F.3d at 410-11. Except in certain "unique and discrete circumstances" that do not apply to the instant litigation (such as, for example, the government's use of religious imagery on public property), the endorsement inquiry does not constitute a distinct Establishment Clause test. Id. at 411. Nonetheless, whether construed as a component of the Lemon / Agostini test or as a stand alone metric, the endorsement analysis does

not lead to the conclusion that Section 702 violates the Establishment Clause. Section 702 is universally afforded to religious organizations. Any endorsement concerns raised by the facts alleged in the Amended Complaint arise with respect to the support that the government defendants provide the Salvation Army, not with respect to the fact that the Salvation Army, as do all religious organizations in the United States, qualifies for an exemption pursuant to Section 702.

The application of Section 702 of Title VII of the Civil Rights Act here does not violate the Establishment Clause, and it precludes plaintiff's Title VII claims, which are accordingly dismissed.

### b. State and Local Employment Discrimination Claims

Plaintiffs have also brought their employment discrimination claims pursuant to Section 296 of the New York Executive Law and Section 8-107 of the New York City Administrative Code. These claims fail as a matter of law, because the Salvation Army enjoys specific exemptions from the antidiscrimination principle promulgated by these statutes. Section 296(11) provides in pertinent part:

> Nothing contained in this section shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment … or admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained.

The Salvation Army is a "religious organization," see Scheiber v. St. John's Univ., 84 N.Y. 2d 120, 126, 615 N.Y.S. 332, 638 N.E. 2d 977 (N.Y. 1994), and the complained of actions are plainly "calculated … to promote the religious principles for which it is established or maintained." N.Y. Exec. L. 296(11). Therefore, the exception of Section 296(11) applies to the Salvation Army's alleged discriminatory practices, see Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc., 968 F.2d 286, 294 (2d Cir. 1992), and plaintiffs' discrimination and hostile work environment claims pursuant to N.Y. Exec. L. Section 296 are dismissed.

As with its state counterpart, Section 8-107(12) of New York City's Administrative Code confers on religious organizations a limited exemption from compliance with the otherwise applicable antidiscrimination law. It provides in pertinent part:

> Religious principles. Nothing contained in this section shall be construed to bar any religious or denominational institution or organization or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting employment … or admission to or giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained.

N.Y.C. Admin. Code § 8-107(12). Plaintiffs contend that the city exception affords a narrower safe harbor than the state exception. Unlike the city exception, the state exception insulates a religious organization from liability for "taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." N.Y. Exec. L. 296(11). The city exception lacks the "taking such action…" language. See N.Y.C. Admin Code. § 8-107(12). Plaintiffs maintain that the city provision therefore governs hiring and firing, but not situations in which religious organizations create religiously hostile work environments, as plaintiffs allege the Salvation Army did here. However, Section 8-107(12)'s language is sufficiently expansive to shield personnel policies of religious organizations beyond those relating to hiring and firing. The city exception's extension of protection to religious organizations for "limiting employment … or … giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained" is broad enough to encompass the type of hostile work environment that the Salvation Army allegedly imposed on plaintiffs. Id.

Plaintiffs maintain that the exceptions contained in N.Y. Exec. L. Section 296(11) and N.Y.C. Admin. Code Section 8-107(12) violate the Establishment Clause and the Equal Protection

Clause.  However, for the reasons discussed above and in <u>Amos</u> in connection with the federal

exception, application of the state and local exceptions is constitutionally sound.

Plaintiffs cannot circumvent the preclusive effect of the state and city exceptions contained

in N.Y. Exec. L. Section 296(11) and N.Y.C. Admin. Code Section 8-107(12).  Consequently,

plaintiffs' employment discrimination and hostile work environment claims pursuant to N.Y. Exec.

L. Section 296 and N.Y.C. Admin. Code Section 8-107 are dismissed.

3. Retaliation Claims

Plaintiffs Lown and Geissman claim that the Salvation Army unlawfully retaliated against

them for attempting to exercise their rights pursuant to antidiscrimination law.  Specifically, Lown

and Geissman allege that they were constructively terminated after asserting the discrimination

charges at bar.  According to Lown and Geissman, the Salvation Army retaliated against them in

violation of the federal, 42 U.S.C. §2000e-3(a),[15] state, N.Y. Exec. L. § 296(7),[16] and city, N.Y.C.

Admin. Code § 8-107(7),[17] prohibitions on retaliation against employees who attempt to invoke

_____

[15] 42 U.S.C. § 2000e-3(a) provides in pertinent part:
   (a) Discrimination for making charges, testifying, assisting, or participating in enforcement
   proceedings.  It shall be an unlawful employment practice for an employer to discriminate against any
   of his employees or applicants for employment, for an employment agency, or joint labor-
   management committee controlling apprenticeship or other training or retraining, including on-the-job
   training programs, to discriminate against any individual, or for a labor organization to discriminate
   against any member thereof or applicant for membership, because he has opposed any practice made
   an unlawful employment practice by this subchapter, or because he has made a charge, testified,
   assisted, or participated in any manner in an investigation, proceeding, or hearing under this
   subchapter.
[16] N.Y. Exec. L. 296(7) provides:
   7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this
   section applies to retaliate or discriminate against any person because he or she has opposed any
   practices forbidden under this article or because he or she has filed a complaint, testified or assisted in
   any proceeding under this article.
[17] N.Y.C. Admin. Code 8-107(7) provides:
   7. Retaliation. It shall be an unlawful discriminatory practice for any person engaged in any activity to
   which this chapter applies to retaliate or discriminate in any manner against any person because such
   person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or
   assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission
   of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the
   commission or the corporation counsel in an investigation commenced pursuant to this title, or (v)
   provided any information to the commission pursuant to the terms of a conciliation agreement made
   pursuant to section 8-115 of this chapter.

antidiscrimination laws against their employers.  To state a claim for retaliation, a plaintiff must

show: "(1) that she participated in a protected activity known to the defendant; (2) an adverse

employment action that disadvantaged her; and (3) a causal connection between the protected

activity an the adverse employment action."  Thomas v. Westchester County Health Care Corp.,

232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002) (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759,

769 (2d Cir. 1998)).

Plaintiffs' Title VII retaliation claim must be dismissed because the broad language of

Section 702 provides that "[t]his subchapter shall not apply… to a religious… institution… with

respect to the employment of individuals of a particular religion…."  42 U.S.C. § 2000e-1(a).  Title

VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is contained in the same subchapter as

Section 702.  Accordingly, it does not apply here.  See Hall, 215 F.3d at 625 (Section 702 "reflect[s]

a decision by Congress that religious organizations have a constitutional right to be free from

governmental intervention.").

The language in the relevant state and city exceptions is more circumscribed than that found

in Section 702.  By their terms, the state and city exceptions only exempt actions taken by a

religious organization "to promote the religious principles for which it is established or

maintained."  N.Y. Exec. L. § 296(11); N.Y.C. Admin. Code § 8-107(12).  The Court cannot

conclusively determine on this motion to dismiss the complaint that the alleged retaliation against

plaintiffs for asserting complaints of discrimination was calculated to promote the religious

principles of the Salvation Army.  Therefore, the state and city exceptions do not compel dismissal

of plaintiff's state and city retaliation claims.

Relief pursuant to the state and city anti-retaliation provisions is not foreclosed by dismissal

of the underlying discrimination claims.  "The law protects employees in the filing of formal

charges of discrimination as well as in the making of informal protests of discrimination, including

making complaints to management, so long as the employee has a good faith reasonable belief that the underlying challenged actions of the employer violated the law."  Gregory v. Daly, 243 F.3d 687, 700-01 (2d Cir. 2001) (citations and quotation marks omitted).  "The employee cannot merely show that she subjectively believed her employer was engaged in unlawful employment practices, but also must demonstrate that her belief was 'objectively reasonable in light of the facts and record presented.'"  Thomas, 232 F. Supp. 2d at 279 (quoting Little v. United Techs., 103 F.3d 956, 960 (11th Cir. 1997)).

The Salvation Army contends that plaintiffs' belief that they had engaged in a protected activity by complaining of the alleged underlying discrimination was objectively unreasonable, given the express provisions of the relevant antidiscrimination laws that insulate religious organizations from liability for discriminating on the basis of religion in employment.  However, plaintiffs need not possess scholarly familiarity with antidiscrimination law in order to satisfy the requirement that they believed in good faith that they had suffered unlawful discrimination.  See Martin v. N.Y. State Dept. of Corr. Servs., 224 F. Supp. 2d 434, 448 (N.D.N.Y. 2002).  Here, plaintiffs may have reasonably believed that they had been subject to illegal discrimination on the basis of religion, particularly in light of the fact that the relevant laws generally prohibit such discrimination.  Moreover, even if plaintiffs had knowledge of the statutory exceptions, they may have believed in good faith that those exceptions were unconstitutional as applied.  The Salvation Army has failed to establish that it was objectively unreasonable for plaintiffs to believe that they had suffered unlawful discrimination.  Therefore, plaintiffs' retaliation claims pursuant to state and city law are not dismissed.

III. CONCLUSION

Plaintiffs have failed to allege any basis for attributing the Salvation Army's allegedly discriminatory personnel actions to the government defendants.  Thus, the government defendants'

motion to dismiss the Amended Complaint is granted except as to plaintiffs' Establishment Clause claim predicated on taxpayer standing.

As the Salvation Army is not a state actor and as it enjoys certain statutory exemptions from liability for religious discrimination, plaintiffs' constitutional and statutory discrimination claims – other than those brought pursuant to state and city law for retaliation – against the Salvation Army must be dismissed.

Accordingly, the government defendants' motion to dismiss the Amended Complaint is granted in part and denied in part, and the Salvation Army's motion to dismiss the Amended Complaint is granted in part and denied in part.

Dated: New York, NY
Sept. 30, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.